# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:09-cr-00794-PD-1 |
| | ) | |
| Plaintiff, | ) | Courtroom 5A |
| | ) | U.S. Courthouse |
| v. | ) | 601 Market Street |
| | ) | Philadelphia, PA 19106 |
| RAYMOND HORSCH, | ) | |
| | ) | June 28, 2012 |
| Defendant. | ) | 1:06 p.m. |

**UNDER SEAL**

TRANSCRIPT OF SENTENCING HEARING
BEFORE HONORABLE R. BARCLAY SURRICK
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | U.S. Attorney's Office<br>By: ELIZABETH F. ABRAMS, ESQ.<br>615 Chestnut Street<br>Suite 1250<br>Philadelphia, PA 19106-4476 |
| For the Defendant: | Office of Jerome M. Brown<br>By: JEROME M. BROWN, ESQ.<br>1628 John F. Kennedy Boulevard<br>Suite 1000, 8 Penn Center<br>Philadelphia, PA 19103 |
| | Kardos, Rickles, Hand<br>and Bidlingmaier<br>By: MARC I. RICKLES, ESQ.<br>626 S. State Street<br>Newtown, PA 18940 |
| ESR Operator/Deputy Clerk: | MICHAEL FINNEY |
| TRANSCRIPTION SERVICE: | TRANSCRIPTS PLUS, INC.<br>435 Riverview Circle<br>New Hope, Pennsylvania 18938<br>215-862-1115<br>CourtTranscripts@aol.com |

Proceedings recorded by electronic sound recording, transcript Produced by transcription service.

## INDEX


| | PAGE |
|---|---|
| Objections to presentence report argued | 3 |
| Motion to Depart from Advisory Sentencing Guidelines by Ms. Abrams | 5 |
| Argument Re Motion to Depart from Advisory Sentencing Guidelines by Mr. Brown | 6 |
| Motion to Depart granted by the Court | 7 |
| Argument regarding sentence by Mr. Brown | 8 |
| Amy McHale addresses the Court | 10 |
| Mr. Rickles addresses the Court | 13 |
| Argument continued regarding sentence by Mr. Brown | 14 |
| Argument regarding sentencing by Ms. Abrams | 17 |
| Allocution by the Defendant | 21 |
| Comments by the Court | 21 |
| Proposed sentence announced by the Court | 23 |
| Sentencing by the Court | 25 |
| The Court advises the Defendant of appeal rights | 25 |
| Request to seal by Ms. Abrams | 26 |

THE COURT: All right, we have the case of the United States versus Raymond Horsch, it's Number 9-794.

Counsel, please identify yourselves for the record.

MR. BROWN: Your Honor, good afternoon. Jerome Brown for Raymond Horsch.

MR. RICKLES: Marc Rickles for Raymond Horsch.

THE COURT: All right. Counsel, we're here today for the sentencing of Mr. Horsch. He entered pleas of guilty to Counts 2, 3, and 4 of the indictment.

You have received a copy of the presentence report. Are there any objections to that presentence report at this time?

MR. BROWN: Your Honor, there is only one objection that we would like to pursue. And that is -- and I just was over showing that the investigator -- presentence investigator a report from the Bureau of Prisons' Medical Health Unit, where they talk about that he has macular degeneration. And also, if needs be, I have his former wife, Amy McHale is here, and she knows that he was receiving treatment for that.

And that is the only thing, I just wanted the Court to know that he does have serious eye issues.

THE COURT: The record does reflect -- I believe the presentence reflects that at one point, he had eye surgery.

MR. BROWN: That's correct, he had cataract surgery.

THE COURT: Yeah.

MR. BROWN: And then I think he had experimental surgery to try to deal with the macular degeneration, which is incurable, as far as I know. But he is suffering from that, and if the Court needs to hear any testimony -- and, again, inmate -- the note from a -- from -- which was attached at Exhibit B, it's the second page of Exhibit B of our supplemental memorandum that was just sent to the Court a couple of days ago, it says, "Inmate was seen today requesting to be seen by eye doctor. Inmate has" -- and I don't know what this means -- "AHX of macular degeneration." And then there were other issues here, but they do mention this. He does have -- he has had some serious eye issues, and it is something that, unfortunately, is going to plague him.

And as a result, they did ask for an eye consult and a hemoccult test request. I did not see any follow-up in the hundreds of pages of records that I had received. I didn't want to send the Court all of them, but -- and this was just a sampling of what there was.

But there was a Dr. Sinclair, S-I-N-C-L-A-I-R for the record, had talked about that. And if the Court needs be, we can either hear from Mr. Horsch or Amy McHale, who is back here who was married to him, and was with him for many years prior to his being arrested in this case. And she is aware of those eye problems.

THE COURT: Well, with regard to the presentence, it

does mention the eye problems. We're going to make the exhibit, specifically the Sinclair letter, a part of the record in this case. I don't know that there needs to be an amendment to the presentence investigation report itself. I'm certainly going to recommend, as part of my sentence, that the defendant receive treatment for the eye problem.

MR. BROWN: All right.

THE COURT: Now if your objection is you want specifically mentioned macular degeneration in the presentence report, I don't see any problem with that. Do you, Counsel?

MS. ABRAMS: Elizabeth Abrams for the Government, Your Honor.

No, the Government doesn't have any objection to that, if that's an amendment the Court intends to make to the PSR.

THE COURT: I think that a mention of macular degeneration --

MR. BROWN: Yes.

THE COURT: -- certainly can be put in the presentence report. So, it can be amended to that extent.

MR. BROWN: Thank you, Your Honor.

And with that, that's all the objections that we do have -- that we are going to pursue today.

THE COURT: All right. The Government has a motion -- the guidelines here are 24 to 30 months. However, there are

mandatory minimum sentences on Counts 2 and 3.

But the Government has a motion, as I understand it. Is that correct?

MS. ABRAMS: Yes, Your Honor. The Government has a motion. And in this case, the guidelines -- because of the operation of the guidelines, the guidelines actually become the mandatory minimum, which is also the 240 months that are applicable to Counts 2 and 3, combined.

And the Government has moved the Court, in accordance with our written papers; I can certainly present to the Court orally if you would like to hear more about that. Basically, the Government is moving on the record to relieve the defendant of those mandatory minimums and the minimum of the sentencing guidelines, the 240 months, for the reasons that are set forth in the written motion.

THE COURT: Counsel, do you have anything you want to add at this juncture?

MR. BROWN: Well, the only thing I would say, Your Honor, is that, first of all, we thank the Government. Ms. Abrams has been absolutely -- went above and beyond the call to give him an opportunity after the original sentencing was scheduled. And he did do -- you know, I think that Your Honor has seen what we've said, but some of the -- what he did -- some of what he did was -- put him in a degree of danger where he is. He was -- activities occurred there, so we -- I just

would make note of that for the Court. I don’t think I need to go any further in describing those activities.

THE COURT: All right. Well, I have reviewed the motion, I have reviewed the sentencing memoranda from counsel.

It’s clear that the defendant has provided significant cooperation. It’s clear that the information that he gave to the Government was reliable. It’s clear that the -- in cooperating, the defendant did certainly put himself at some risk.

The cooperation was timely. And I’m satisfied that the defendant certainly should receive a downward departure under 5K1.1 and departures under 3553(e).

So I will grant the motion and we will determine what appropriate departures are after I’ve heard everything. All right?

Counsel, I’ll hear what you have to say.

MR. BROWN: All right, thank you, Your Honor. Your Honor, if I might, I know the Court has reviewed both the -- I’m sure, our initial presentence memorandum, which was lengthy, and our supplemental presentence memorandum. I think I’d like to make some opening remarks, if that’s all right with the Court. And then I would like to present a witness, and Mr. Rickles would like to speak. And then if I might, I would come back and close out everything, if that’s agreeable to Your Honor.

THE COURT: All right. You should understand, I have read your sentencing memoranda.

MR. BROWN: Yes.

THE COURT: I'm familiar with them. They were comprehensive, and we'll make them a part of the record.

MR. BROWN: Thank you, Your Honor.

Your Honor, in looking at Ray Horsch, he's someone that I first met about 40 years ago. I had actually dated his sister at that time. And I met him -- when I first met him, he was a feature filmmaker, maybe in the pornography business, but it was a rather mainstream movie. It had a plot. It had humor. It had -- it was not just a hardcore pornography movie. And he was a person of a lot of promise.

I've looked at his life. And I've seen the good parts. I've seen the bad parts. I know there's a lot of good parts, and I think Ms. McHale will come up and tell Your Honor about that.

He is a person who has had some -- some significant successes, but a lot of failed promise because of who he is. And he's gone through a lot in his life, and he's gone through a lot in the last three years. One of the things that struck me the most is that he has had no human contact outside of the confines of the prison, other than with Mr. Rickles or myself, and the good people sitting across from me at the table with the prosecution, Ms. Abrams and Mr. Markovic. Other than that,

he's had no outside human contact in three years.

He is a 69-year-old person. There are very few 69-year-olds in the prison. This has been a very depressing, lengthy time. It seems to me like it's been forever since he was arrested. I know it's about three years. It must seem to him like it's been a lifetime. And I hope the Court will consider that in imposing its sentence.

The other thing I wanted to say was that one of his problems is that whenever Your Honor allows him to be out, is that he has lost everything, and he has -- and he is losing the tools to help himself. So whatever sentence the Court imposes -- and I know there's going to be a mandatory period of eight years of supervised release, so he will be under the Court's thumb, so to speak, for quite some time in the future. I just hope that the Court will take that into consideration in imposing sentence, that to give him some opportunity to live out whatever rest of his life he has.

With that, I would like to call Amy -- first of all, I would like to recognize some people that are here. There's his son Eugene Horsch. If you would stand up, please? His sister, Virginia Killian; and his former wife, Amy McHale are here --

THE COURT: The first individual who stood up was? I didn't hear the name.

MR. BROWN: I'm sorry, his son, Eugene Horsch.

THE COURT: His son Eugene, all right.

MR. BROWN: And I would have Eugene speak today, but, Your Honor, is in a [redacted] state. He's [redacted], and I think it would -- I think he's nervous, and I -- and I think that that is -- I think it would be inappropriate to have him speak today.

But if I can, if I -- can I have Mrs. McHale come up? Your Honor, is it okay if she stays here, or would you like her to come to the podium?

THE COURT: She can come right up to the podium and speak into the microphone.

Your name for the record?

MS. McHALE: Amy McHale.

THE COURT: All right. Ms. McHale, you did write me a letter, which I have read, but I will hear whatever you have to say.

MR. BROWN: First of all, Your Honor, if I may just give her a few questions? She's very nervous.

MS. McHALE: I am nervous.

THE COURT: Go right ahead.

MR. BROWN: Ms. McHale, first of all, what do you do for a living?

MS. McHALE: I'm a paralegal.

MR. BROWN: Okay. And can you tell His Honor some of the attorneys that you worked for?

MS. McHALE: I've worked for Norrie Gelman. I've worked for Jerome Brown. I work for Glen Barry. That's it.

MR. BROWN: Okay. And how long have you known Mr. Horsch?

MS. McHALE: Since -- it had to be '99.

MR. BROWN: Okay. And you were married to him? And you're now --

MS. McHALE: Yes, we were married.

MR. BROWN: And you're now divorced?

MS. McHALE: Yes.

MR. BROWN: Okay. What -- can you tell His Honor a little bit -- I know you've wrote a letter. Can you tell His Honor a little bit about the good -- some of the good things about Mr. Horsch? Could you tell him some -- about some of how he's helped you and/or how he's helped some other people in the community?

MS. McHALE: When I met Ray, I was at a really low point in my life. I met him the way he's met many of the other girls. I was out there on the street doing drugs. He took me in. Encouraged me in every way to get help for my addiction. He helped me get into Peirce College. He supported me in every way he can. I've seen him help other girls who were in my position. Even while we were together, you know, sometimes girls would come and stay. And I supported him in that because of how much he helped me.

MR. BROWN: And today, you're -- you've been a paralegal for how long?

MS. McHALE: Five years.

MR. BROWN: Now, were you able -- were you able also to accompany him on some trips where he was an art exhibitor?

MS. McHALE: Yes. Yes.

MR. BROWN: Can you tell His Honor where you went to?

MS. McHALE: We went to Rome. We went to Las Vegas. We had also been to Los Angeles. The -- in Rome, the -- it was a -- it was, like, a art installation. It was all his artwork. And it was very impressive.

MR. BROWN: And did Mr. Horsch seem to have followings in the three different places where --

MS. McHALE: Yes.

MR. BROWN: -- you went to the exhibit ==

MS. McHALE: Yes, and he's -- people have come in to interview him. He's -- he's very talented at what he does. He does have a following.

MR. BROWN: Okay. Anything else you want to tell His Honor?

MS. McHALE: Ray tries to be very helpful to others. He -- he has -- you know, I don't want this to come out wrong. He's done some bad things but he, deep down, is a really good person. He wants to help people. And I don't know if he always goes about it the right way, but he helped me

tremendously. I don't know what happened to many of the other girls, but I am able to live a full life now because of Raymond.

THE COURT: Thank you.

MR. BROWN: Your Honor, I think I'll turn this over to Mr. Rickles, because he wants to say something.

THE COURT: Mr. Rickles?

MR. RICKLES: If I may, Your Honor, just very briefly. Your Honor, I've represented Raymond Horsch, minor criminal matters, civil matters. I've represented his son, his sister. I've represented his mother years ago.

The -- and I know that Ray, as you can tell from the presentence report, he basically walks the beat of a different drum. But I suggest to you that, you know, with his art -- some of the things that his former wife has said, his art and his knowledge of science, where he's written -- he wrote a book on fuel from waste whey products, W-H-E-Y products.

He has -- I suggest he's enhanced society in many ways through his art and his science. And I've seen evidence of his help of, you know, drug-addicted people who have lost their way, how he's tried to help them.

He's -- I suggest to the Court that one of the reasons we mentioned this macular degeneration and so forth is, he's not a healthy man. He's 69 years old, and he has health issues. He -- I don't know if you can tell, but the letter

that was given to you, there were some typos in that letter. He can't see some of those things. He's a bright guy, he can spell. And I suggest he would have seen those things, but his eyes don't focus properly. The left and the right don't focus like yours and mine do.

And I suggest to the Court that I don't think you'd see Ray again in a criminal setting. I think that the last three years or more have impressed him very much with, you know, what he's lost. And maybe impressed him with, like, you know, he hasn't been the best dad in the world, and I think he's seen things that it's not too late for him to help his son who has some issues who is also a very bright young man.

You know, his sister's in the courtroom. She has her master's in microbiology. She works as a microbiologist.

You know, their mom was a very artistic and very bright, as well.

And I suggest that there's a lot of hope for Ray, even at this stage of his life, and ask you to consider that when you fashion a sentence for him.

THE COURT: All right.

MR. BROWN: Your Honor, and I do -- I echo some of Mr. Rickles' comments. I think that it's been very sad to watch him over the last three years. And I'm involved in this case, I'm involved in it pro bono, I've done it. When he was arrested, his son was -- was also -- went off the deep end.

And because of drug use problems, he was incarcerated for four months. There was no one to take care of either one of their properties. And Ms. McHale put herself out there and was willing to do that. And I had to take care of a lot of their affairs, but there was -- and his sister was able to do some of that, but she has her own family. She was taking care of his house up in Bucks -- in Chalfont, which is now gone. So, I mean, he literally has lost virtually everything that he owned at one time in his life.

And it’s just sad and tragic to watch this. And it’s sad to watch what he’s doing to himself. And he is, I think, losing the ability -- because he does so much visually, he’s losing any kind of ability -- he will be more and more losing the ability to kind of help himself and help his son.

I know that he will -- he will tell you, but I know that he also wants to be able to get out so that he can try to give his son some type of foundation, because he’s not going to be around forever. And his son will be, you know, how old he’ll be when he’s gone. And, you know, he wants to be able to try to give him -- be a much better dad and giving him a much better foundation for what he’s doing.

I think he’s been incarcerated for three years. He basically -- if you saw some of the notes, basically he sits in his bunk all day long. And he’s a bright guy, but he’s got -- you know, he’s a little bipolar, too. So he has these racing

thoughts and, you know, there's nowhere to go. So it's a -- it's been a difficult thing.

I think that he is very devoted to his son. They're very devoted to each other. I mean, basically, it was -- when I say there was nobody else, there was nobody else to help try to take care of things with -- and with -- of their affairs. And it was tough to do it, but I did it because I know he's -- deep down inside, he's a good person. I'm not his best friend or the greatest friend, but I was somebody out there, and I know both of them. And I couldn't let him -- let his affairs just completely go to the pot. And also -- no pun intended. And also, not put everything on Ms. Killian, who I know could not handle both a house in Philadelphia and a home in Chalfont, since she lives in Montgomery County.

In any event, I would just say to the Court, I know the Government and I are going to have differences as to where the Court should start. I still think – and I agree with the Government – that the 24 to 30 months is the guidelines, albeit the -- and the other ones are artificial. And I think the Court should take into consideration the 24 to 30 months.

I think the Court, when imposing the sentence, Your Honor will note that he does have eight years of supervised release. So he's going to be under the thumb of someone, including Your Honor, for quite some time. So I just hope that the Court can put that into its calculus. I hope the Court can

allow him to get out so he can be a help to his son and be -- and redeem himself a little bit to society, which I know he wants to do, and continue to do.

I know he was working on a project with Thomas Roche, R-O-C-H-E, about prostitution and heroin addiction, and the effects that they have, and the devastating effects they have on women. And he was -- and he would go to -- he would go in and talk to these women constantly on the streets of Kensington. In fact -- and I don't have it with me, he even had a letter from Mayor Street that said, if you -- don't arrest him because he's doing something good here. He's not -- just because he goes up to these women, he's not doing it for purposes of soliciting. So there was -- you know, there -- he was doing some good works. And I hope Your Honor gives him the opportunity to do that in the future.

THE COURT: All right. Counsel?

MS. ABRAMS: Thank you, Your Honor.

Your Honor, the defendant's situation, while sad it may be, but it is a situation of his own making. This is a man who has skills and who has intelligence that is beyond almost any person that comes through this court as a criminal defendant. And he is somebody who has had legitimate employment, and had opportunities in the law-abiding world that he chose not to pursue.

He has a longstanding criminal record. Much of it is

old, and it doesn't count towards his criminal history points, and that's fair.

However, he absconded for a period of years. This is a person who, over time, for a long time has not paid much attention to the law and has not seemed to -- in some ways, has not seemed to think it applicable to him.

Clearly, he has health problems that will have to be addressed during any sentence. And I do believe that, partly as a factor of the aging, and obviously that we have had the opportunity to sit down and meet with him on several occasions -- and I do believe that he is -- has made a genuine effort or else we wouldn't have put forward our motion to the Court.

So I think that there is hope that he would not continue on that path, but certainly his history is one of disregard for the law. And his actions involved firearms that can't be possessed without -- he had sawed off shotguns, which are not lawfully possessed by anybody without a special tax license from ATF. But not by him in any regard because he's not even allowed to have a handgun because of his past.

THE COURT: With regard to those weapons, there was some suggestion in the materials that I read that one of them was like an antique, and one of them was a military weapon that had been given to him by his grandfather who fought in the Second World War, or something of that nature. Is that -- are they accurate statements?

MS. ABRAMS: Your Honor, the weapons that he had were capable of firing modern ammunition, and they were held -- they were all in the bedroom.

He did also have some other weapons that do not count and are not regulated by ATF, that were black powder guns. But the guns that he had, I don't dispute where he got them, but he had them in his home where he had his grow operation, and he has admitted that those were in furtherance of his trade.

Now, I'm not -- there's no charge that he bought them in an illegal transaction, but he was not permitted to possess them under any circumstances. As I said, not even permitted to possess a handgun legally.

But he -- but I don't dispute his -- we have no reason to dispute his account of how he came to possess the firearms.

THE COURT: The charge of possession with intent to distribute, we're talking about marijuana, we're talking about marijuana plants. Is it the Government's position that Mr. Horsch was, in fact, growing the stuff and selling it?

MS. ABRAMS: Yes, Your Honor, it was a staged grow operation. It had lights and ventilation. It very sophisticated. There were 455 plants, if I recall, that were recovered, all in different stages of maturation.

There was also some evidence that there was processing going on, in terms of, I think, drawing it out and

putting it into some kind of a compact package.

THE COURT: All right.

MS. ABRAMS: It wasn't a personal use kind of operation for certain. And we do have information that it was actually sold to a person who further distributed it.

THE COURT: All right. Go ahead, I interrupted.

MS. ABRAMS: Your Honor, in other respects, I would just -- I know the Court has reviewed the submissions that we've made, and so I would just point the Court's attention to the written memoranda. I don't know that I have anything further to add, other than Mr. Brown misstated my position on the guidelines. As I understand it under the guidelines, Mr. Horsch's guidelines are 240 months, not the 24 to 30.

I would just point out that 24 to 30 is the guideline level that's applicable to Counts 2 and 4. It does not account for Count 3 because of the structure of the guidelines when you have that mandatory ten years. It doesn't get added in as a sentencing factor or accounted for in any other way under the guideline calculation. Now we have made our motion, and the Court can consider that. But that 24 to 30 months is an artificially low calculation once -- because it takes out of consideration Count 3.

THE COURT: All right. All right, Counsel, do you want to bring your client forward?

MR. BROWN: Yes. Yes, Your Honor.

THE COURT: All right, Mr. Horsch, in a few minutes I'm going to impose a sentence on you. But before I do that, I will hear anything that you want to say to me.

MR. HORSCH: Thank you, Your Honor. Just as succinctly as possible, it's been pointed out that I've done some very bad things in my life. I'd just like to point out that I've also done some good things. And if I have any time left, I'd like to spend that trying to do some good things to offset the bad things that I've done. I'd like to be able to spend time with my son, and I certainly accept total responsibility for everything that I've done. I'm very ashamed of myself, and I guess that's all I can think to say. I'd just like the opportunity to tip the scales in the other direction a little bit, if I can.

THE COURT: All right. The sentencing guidelines are the 24 to 30 months, as counsel has indicated. There were mandatory minimum sentences here, but for the cooperation that you gave, you would be facing 240 months in jail.

I have to decide what is an appropriate sentence in this situation. I look at your background, Mr. Horsch, and in many respects, it is almost tragic. You are a brilliant person. You have incredible talent. You have used that talent, and I don't think there was any need for you to get involved in the criminal activity that's reflected in the presentence investigation report or the criminal activity that

we're dealing with here. It's really a very unfortunate situation that someone with your talent would go down the road that you have been on.

Now, to be sure, the adult criminal convictions are from many years ago, but the present offense was occurring at the present time, and -- or in 2009 anyway. And it's almost inexplicable why someone that has your abilities would be involved in that. It just makes no sense to me.

You have physical problems, there's no question about that, and I'm going to take that into consideration.

You have evidently, over the years, spent time helping other people, and you do have a situation with your son which needs your attention. The presentence report and the sentencing memorandum reflect that, and I'm going to take that into consideration also.

I have to impose a sentence on you, Mr. Horsch, that punishes you for what you've done.

I have to impose a sentence that's going to deter others from getting engaged in this kind of conduct.

I have to impose a sentence that's going to protect the public. It is my sincere hope that the public really doesn't need to be protected from you anymore. You're 69 years old at this point in the ball game, and to continue with criminal activity would just be about the most senseless thing I can imagine.

And I have to impose a sentence on you that's going to rehabilitate you.

The Government's sentencing papers have indicated where the Government feels the Court should be coming down on this. But for a number of reasons, I don't feel that it's necessary to put you in jail for an extended period of time. I think at 69 years old, with your talents, you should be able to move forward with your life and be productive in the ways that you can be productive during the rest of your life expectancy.

I am going to impose a sentence on you that I think is reasonable under all of the circumstances. That sentence is going to be a sentence of four and one-half years, okay?

There is supervised release that follows jail. The defendant has -- the defense counsel has suggested that the mandatory supervised release of eight years is still operative. Does the Government take that position, too?

MS. ABRAMS: Your Honor, I personally haven't reviewed or looked into that. I do know that 3553(e) says any mandatory that is applicable. If you'd like, I can certainly check with the people in my office who have reviewed it, but I -- under that language, I think that it is a reasonable reading of that language to say that the minimum supervised release is a minimum that would no longer apply.

THE COURT: That it would no longer apply, that was my assessment of the situation.

Well, in any event, I'm going to place you on supervised release for a period of five years. That will give the Government the opportunity to keep track of you. And if you get out, and you start engaging in the kind of conduct that got you here, you're going to end up back in jail, you understand that. And you're certainly intelligent enough to understand that.

I'm not going to impose any fine. I don't think any useful purpose would be served by that, but I think that that is a reasonable sentence under all the circumstances, considering all of the facts that I have reviewed in this matter.

Counsel, do you have anything else?

MR. BROWN: No, Your Honor.

MS. ABRAMS: Your Honor, just to clarify that on Count 4, the supervised release term will be three years for Count 4, and five years for Counts 2 and 3?

THE COURT: Right.

MS. ABRAMS: And I'd just also like to point the Court's attention to the forfeiture papers that were filed yesterday, and would request that you sign that order. That was part of the agreement between the parties. I don't believe there are any objections.

THE COURT: I have those papers and I will sign them.

All right. Counsel, anything further before I

formally impose the sentence?

MR. BROWN: Your Honor, just -- the only thing that -- with the supervised release, all the periods will be running concurrently.

THE COURT: Yes.

MR. BROWN: Thank you.

THE COURT: Pursuant to the Sentencing Reform Act of 1984, it's the judgment of this Court that you, Raymond Horsch, be committed to the custody of the Bureau of Prisons for a period of 54 months.

Upon your release, you're placed on supervised release for a period of five years on Counts 2 and 3, and three years on Count 4. Those periods to run concurrently with each other.

No fine is imposed.

You're to pay the Special Assessments of $300.

And you are to stand committed until that sentence is complied with.

You are to be given credit for the time that you've already served. I believe you were initially incarcerated in the state in July of 2009. You're to receive credit for that time.

Do you understand that sentence, Mr. Horsch?

MR. HORSCH: Yes, Your Honor, I do.

THE COURT: Do you understand that you have a right

to appeal? Your appeal rights are limited, but nevertheless, I'm obligated to tell you that if you want to file an appeal, it has to be done within 14 days, and we'll give you an attorney free of charge to do it. Do you understand that?

MR. HORSCH: Yes, Your Honor.

THE COURT: Anything further?

MR. BROWN: No, Your Honor. Thank you so much, Your Honor.

MS. ABRAMS: Your Honor, I just move the Court to seal the transcript of these proceedings.

THE COURT: We will seal the record.

Mr. Horsch, good luck.

MR. HORSCH: Thank you, Your Honor.

MS. ABRAMS: Thank you, Your Honor.

(Whereupon, at 1:46 p.m., the hearing was adjourned.)

CERTIFICATE OF TRANSCRIBER

I, KAREN HARTMANN, a certified Electronic Court Transcriber, certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

/s/ Karen Hartmann

Karen Hartmann, AAERT CET Date: October 31, 2026

TRANSCRIPTS PLUS, INC.